Martinous Olyn MOORE  *v.*  STATE of Arkansas

CR 07-804                                279 S.W.3d 69

Supreme Court of Arkansas
Opinion delivered March 6, 2008

*William A. McLean* and *Robert L. Depper, Jr.*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Appellant Martinous Moore was convicted by a Pulaski County jury of capital murder and aggravated robbery, for which he received a sentence of life imprisonment without the possibility of parole plus 480 months, to run concurrently. He now appeals, alleging three points of error: 1) the circuit court erred in denying his motion for directed verdict; 2) the circuit court erred in denying his motion for mistrial; 3) the circuit court erred in allowing the hearsay testimony of an alleged co-conspirator. Because Moore received a sentence of life imprisonment, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2) (2007). We find no error and affirm.

## I. Sufficiency of the Evidence

In support of his position that the circuit court erred in denying his directed-verdict motion, Moore asserts that the evidence was insufficient to support the aggravated-robbery conviction. Aggravated robbery was both a separate charge and the felony underlying the State's felony-murder theory. Moore points out that there was no evidence to indicate that he verbally assented to the robbery plan allegedly hatched by a co-conspirator and that there was no evidence of a theft or attempted theft. We believe these arguments are meritless and conclude that the evidence was more than sufficient to support both convictions.

We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Cluck v. State*, 365 Ark. 166, 226 S.W.3d 780 (2006). This court has repeatedly held that in reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the State and consider only the evidence that supports the verdict. *Id.* We affirm a conviction if substantial evidence exists to support it. *Id.* Substantial evidence

is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.*

Furthermore, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* The credibility of witnesses is an issue for the jury and not the court. *Id.* The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

The testimony at trial revealed that Moore and his co-defendants, Marques Tavron and Gavino Mazurek, agreed on a plan to rob Brady Alexander, whom Tavron and Mazurek knew because they attended the same high school. Casey Harvey, the girlfriend of Tavron's brother, testified that she had been living with Moore and Tavron in various motels and in Moore's car during the weeks leading up to the robbery. The car needed a new starter, which they could not afford. Mazurek knew that Alexander had made money by selling drugs. In addition, Patrick Peters testified that his friend Alexander was saving money to buy new rims for his vehicle and that the two of them together had accumulated three to four thousand dollars. According to Peters, Mazurek came to Alexander's home a few days before the robbery and observed Alexander and Peters counting the money. Harvey testified that she witnessed Mazurek suggest to Moore and Tavron that they rob Alexander by setting up a drug transaction, whereby they would lure him to a predetermined location, drive to an ATM, and force him to withdraw money for them.

On the night of April 19, 2006, Alexander and Peters drove in Alexander's vehicle to the Waffle House restaurant on Scott Hamilton Road. Peters testified that they planned to meet Mazurek there and buy marijuana from him. Cellular phone records admitted into evidence showed that Alexander and Mazurek exchanged several calls during the evening. Peters and Harvey both testified that they overheard these calls, in which Mazurek told Alexander where to meet him. The records indicated that Mazurek was in the vicinity of downtown Little Rock when some of the calls were made, despite the fact that he told Alexander that he was in the Waffle House restroom. While Alexander and Peters waited in the parking lot for Mazurek to emerge, a person later

identified as Moore approached the vehicle. When Moore said that he was "Gavino's boy," Alexander permitted him to enter the vehicle.

Soon after, Peters exited the vehicle and was standing in the parking lot when he was approached by Tavron, whom he knew from school. Tavron told Peters that Alexander was about to get "hit" and showed him a handgun tucked into his waistband. Peters immediately heard a gun fire from inside Alexander's vehicle, and he heard Alexander scream. The vehicle lit up with the blast, and Peters saw Moore leaning into the front seat. Harvey testified that she heard the gunshot from a room at the nearby Red Roof Inn, where she, Moore, and Tavron had rented a room for the night. She ran to the window, which looked out over the Waffle House parking lot, and saw Alexander's vehicle speeding away. Neither Moore nor Tavron were in the parking lot.

When Alexander's parents and the police were informed of the shooting, they drove to the Waffle House, where they could find neither Alexander nor his vehicle. At 10:27 P.M., a call came into Mrs. Alexander's cellular phone from a private number, later determined to be Tavron's. Mr. Alexander answered the call and heard his son on the line. Brady Alexander informed his father that he was driving around and that he could not return to the Waffle House because he was running out of gas. He also spoke with Officer Regina Goss of the Little Rock Police Department and told her that he was fine. However, Officer Goss testified that he sounded hesitant. This phone call was the last communication with Alexander. Phone records showed that a 911 call was placed from his telephone number between 10:00 and 10:30 P.M. The call was picked up by the cellular tower near Wrightsville.

The following day, Alexander's body was found in the vicinity of Wrightsville where his vehicle had been abandoned. Dr. Daniel Konzelmann, an associate medical examiner at the Arkansas State Crime Laboratory, testified that the cause of death was gunshot wounds to the neck and right thigh. Preston Williams, Moore's cousin, testified that sometime after midnight on April 20, he picked up Moore and Tavron at the Bada–Bing Club in Wrightsville. The club was located 2.4 miles from the site where Alexander's vehicle was found. Williams took the two to the Motel 6 on Scott Hamilton Road, near the Waffle House and the Red Roof Inn. According to Harvey's testimony, Moore and Tavron returned to the rented room at the Red Roof Inn several

hours from the time they had left, and they appeared to have changed into someone else's clothes.

The evidence was further corroborated by David Sharp, who testified that Moore had confessed the crime to him while the two shared a cell at the Pulaski County jail. According to Sharp, Moore stated that he and Tavron forced Alexander out of the vehicle and into a sleeping bag on the ground, where Moore placed a pillow between Alexander's neck and the gun before firing. Alexander's body was found in the sleeping bag, with the pillow covering his face. Dr. Konzelmann testified that, during the autopsy, he found some small cloth fragments within the wound path, which suggested to him that there had been some type of cloth between the muzzle and the skin at the time of discharge. He also stated that the wound in Alexander's neck was surrounded by a square-shaped bruise consistent with the imprint of the gun's muzzle, indicating that Alexander was shot at very close range.

■ A robbery is committed if a person employs or threatens to immediately employ physical force upon another person, with the purpose of committing theft or resisting apprehension immediately after committing theft. Ark. Code Ann. § 5-12-102(a) (Repl. 2006). A robbery becomes aggravated if the person is armed with a deadly weapon, represents by word or conduct that he or she is armed with a deadly weapon, or inflicts or attempts to inflict death or serious physical injury upon another person. Ark. Code Ann. § 5-12-103 (Repl. 2006). Substantial evidence indicates that Moore was armed with a deadly weapon for the purpose of committing theft. A person commits theft if he or she knowingly takes or exercises unauthorized control over, or makes an unauthorized transfer of an interest in, the property of another, with the purpose of depriving the owner of the property, or obtains the property of another by deception or threat, with the purpose of depriving the owner of the property. Ark. Code Ann. § 5-36-103 (Repl. 2006). As indicated by the testimony of Casey Harvey, Moore was part of a plan to take Alexander's money. This evidence is corroborated by the testimony of David Sharp, who stated that Moore described the robbery plan in his confession.

We reject Moore's argument that the aggravated robbery was not established because there was no evidence of a theft. A conviction of aggravated robbery does not require that a theft actually occur; it only requires that the perpetrator act with the purpose of committing theft or resisting apprehension immedi-

ately after committing theft. *See* Ark. Code Ann. § 5-12-102. We have stated that the focus of aggravated robbery is on the physical force used or threatened, and if the defendant has the intent to commit a theft, no actual transfer of property needs to take place for the offense to be complete. *Winston v. State*, 368 Ark. 105, 243 S.W.3d 304 (2006). Likewise, we can find no merit in Moore's contention that the evidence did not show his assent to the robbery plan. Moore and Tavron both clearly followed through with the plan, whether or not they verbally acknowledged their agreement at the time the plan was conceived.

A person commits capital murder if, acting alone or with one or more others, he or she commits or attempts to commit aggravated robbery and, in the course of and in furtherance of the aggravated robbery or in immediate flight therefrom, the person or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life. Ark. Code Ann. § 5-10-101(a)(1) (Repl. 2006). The evidence supports the notion that Alexander's death was caused in the course of the aggravated robbery. Moreover, the manner of his death indicates that it was caused under circumstances manifesting extreme indifference to the value of human life. *See Flowers v. State*, 342 Ark. 45, 25 S.W.3d 422 (2000) (holding this requirement satisfied where victim died from a large-caliber gunshot wound to the chest and gun was fired from close range). In addition, David Sharp's account of Moore's confession indicated that Alexander was crying and pleading for his life before he was killed. We conclude that substantial evidence supports the capital-murder and aggravated-robbery convictions; thus, the circuit court did not err in denying Moore's motion for directed verdict.

## II. Motion for Mistrial

For his next point on appeal, Moore asserts that the circuit court erred in denying his motion for mistrial, which was requested after the court ejected an unruly spectator from the courtroom. According to Moore, this action resulted in a perception that the court endorsed the testimony of Casey Harvey, the witness on the stand at the time. Harvey testified on behalf of the State. For these reasons, Moore argues that he was prejudiced to the extent that no curative instruction would ameliorate the prejudice.

However, we decline to address this argument, as it was not properly preserved for our review. The record reveals that

Moore failed to argue below that the court's action caused the jury to believe that the court endorsed the testimony of the State's witness. Instead, Moore's counsel made the motion for mistrial on the basis that the ejected spectator was related to Moore. We have stated that arguments not raised at trial will not be addressed for the first time on appeal. *Tryon v. State*, 371 Ark. 25, 263 S.W.3d 475 (2007). Parties cannot change the grounds for an objection on appeal and are bound by the scope and nature of the objections and arguments presented at trial. *Id.*

### III. Hearsay Testimony of Alleged Co-Conspirator

Finally, Moore alleges that the circuit court erred in allowing Casey Harvey to testify as to Mazurek's statements to Moore and Tavron regarding the robbery plan. Moore argues that the statements were inadmissible hearsay not covered by the exception for statements of a co-conspirator made in furtherance of the conspiracy, because the existence of a conspiracy was not established. This court has held that trial courts are afforded wide discretion in evidentiary rulings. *Davis v. State*, 365 Ark. 634, 232 S.W.3d 476 (2006). We will not reverse a trial court's ruling on the admission of evidence absent an abuse of discretion, and, likewise, we will not reverse absent a showing of prejudice. *Id.*

Our evidence rules indicate that a statement is not hearsay if it is offered against a party and is a statement by a co-conspirator of a party made during the course and in furtherance of the conspiracy. Ark. R. Evid. 801(d)(2)(v) (2007). Pursuant to this rule, Harvey's recitation of Mazurek's statements explaining the robbery plan would not be hearsay if Mazurek was a co-conspirator of Moore and if Mazurek made these statements during the course and in furtherance of the conspiracy. The fact that a conspiracy was not charged in Moore's case is irrelevant. We have held that there need not be a conspiracy count in the indictment to make the provisions of this rule applicable. *Smithey v. State*, 269 Ark. 538, 602 S.W.2d 676 (1980). Rather, the alleged co-conspirator must be connected to the conspiracy by evidence independent of the statement at issue. *Henderson v. State*, 329 Ark. 526, 953 S.W.2d 26 (1997); *Pyle v. State*, 314 Ark. 165, 862 S.W.2d 823 (1993).

We hold that overwhelming evidence supports the conclusion that Moore conspired with Mazurek and Tavron. While Moore and Tavron may not have voiced their agreement with Mazurek's plan at the time the plan was formulated, their

actions showed their mutual agreement. They carried out the steps of Mazurek's plan exactly as Mazurek had suggested. Communication among the three suggests that they were operating as a group of conspirators. The cellular phone records admitted into evidence showed several calls among them on the night of the robbery and murder. Harvey testified to one particular call she overheard between Moore and Mazurek, wherein Moore asked if Alexander was in the Waffle House parking lot as he looked out the motel-room window. Harvey stated, "Is he out there, is that his car is what I heard M.J. [Moore] say." Moore left the motel room immediately thereafter. Additionally, Sharp testified that Moore told him that "Gavino had set, was the middle man to set it up." Thus, independent evidence shows the existence of a conspiracy. The statements made by Mazurek to which Harvey testified were clearly offered against Moore and were made during the course and in furtherance of that conspiracy. Therefore, the circuit court did not err in admitting these statements.

## IV. Rule 4-3(h) Review

Pursuant to Ark. Sup. Ct. R. 4-3(h), the record in this case has been reviewed for all objections, motions, and requests made by either party, which were decided adversely to Moore, and no prejudicial error has been found.

Affirmed.

BROWN, J., not participating.