2010 Ark. App. 153

**Debra JOHNSON, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 08–1239.**

Court of Appeals of Arkansas.

Feb. 17, 2010.

Robert L. Depper, Jr., El Dorado, for Appellant.

Karen Virginia Wallace, Asst. Atty. Gen., for Appellee.

ROBERT J. GLADWIN, Judge.

Appellant Debra Johnson appeals her March 6, 2008 conviction by a Union County Circuit Court jury on a charge of murder in the second degree, with a firearm enhancement, for which she was sentenced to a total of 450 months' imprisonment in the Arkansas Department of Correction. Appellant raises nine points on appeal. She challenges the sufficiency of the evidence to support the conviction and also argues that the circuit court erred in admitting into evidence (1) a compact disc recording of a 911 call; (2) photographs of items in the front seat of the victim's car; (3) the transcript of her statement made to Captain Bill Hickman; (4) opinion testimony from Captain Bill Hickman as to whether appellant's mood fluctuated during her statement; (5) opinion testimony from Captain Bill Hickman regarding various discrepancies in appellant's statement, including information about articles in the front seat of the victim's car; and (6) in denying appellant's motions for a mistrial; (7) in refusing to allow into evidence a letter that denied a handgun permit to the victim; (8) in refusing to

allow the testimony of a nurse practitioner about the potential effects of Hydrocodone. We affirm.

*Facts*

On November 8, 2006, Danny Johnson was shot in the left wrist. The bullet that entered his left wrist, traveled up his forearm, severed the ulnar artery, and exited near his left elbow was fired from a .38–caliber handgun that was in the hands of appellant, Mr. Johnson's wife. The gunshot wound was the primary cause of Mr. Johnson's death, although a blunt-force-trauma injury to his scalp also contributed to his bleeding to death.

On or about December 13, 2006, the State filed an information alleging that on November 8, 2006, appellant committed the offense of murder in the second degree, in violation of Arkansas Code Annotated section 5–10–103(a)(1) (Repl.2006), a Class A felony, by knowingly causing the death of Mr. Johnson under circumstances manifesting extreme indifference to the value of human life. The information also included a firearm enhancement, pursuant to Arkansas Code Annotated section 16–90–120 (Repl.2006), regarding the employment of a firearm during the commission of the offense.

A jury trial was held on March 3, 2008. Witnesses for the State included the following: Adam Craig, a medical examiner with the Arkansas State Crime Laboratory; James R. Looney, the chief firearms and tool-mark examiner with the Arkansas State Crime Laboratory; Beth Craig, a dispatcher with the Union County Sheriff's Office; Juan M. Reyes, Jr., an investigator for the Union County Sheriffs Office; Andre Lovett, a deputy sheriff for the Union County Sheriff's Office; Todd Graves, a friend of Mr. Johnson; Clark Burton, a detective for the Union County Sheriff's Office; and Captain Bill Hick-

man, the chief investigator for the Union County Sheriff's Office. After the State rested, appellant's counsel moved for a directed verdict on the basis that the State failed to prove that appellant knowingly caused Mr. Johnson's death. The circuit court denied the motion, finding that the jury could find that appellant's conduct was of such a nature that it was practically certain that the conduct would cause such a result.

The defense initially proffered testimony from Patrick Kirby, the assistant administrator for concealed-handgun licensing, regarding a letter dated May 1, 1996, in which Mr. Johnson was denied a handgun permit. Attached to the letter was a letter from Chief Tate, of the El Dorado Police Department, also dated May 1, 1996, which indicated "attached is his local history for your review." Mr. Kirby indicated that the attachment was not proffered to the court because it was not specifically requested by defense counsel. None of the documents related to the denial letter were admitted into evidence.

Also testifying for the defense were: Juan M. Reyes, Jr.; Clark Burton; James T. Cranford, an employee of Mr. Johnson; Debra Ann Walthall, a business acquaintance and friend of Mr. Johnson and appellant; and Jamie Sharp, appellant's daughter and Mr. Johnson's stepdaughter. Additionally, appellant Debra Johnson testified on her own behalf.

The defense also proffered testimony from Jena Marie Grant, a nurse practitioner, regarding the potential effects that Hydrocodone might have had on Mr. Johnson's personality the day of the shooting. The circuit court did not allow the testimony into evidence because Ms. Grant had not treated Mr. Johnson and had not prescribed the medication for him; accordingly, the circuit court determined that she was not qualified to present testimony.

Defense counsel also presented proffered testimony from Ms. Grant regarding a consultation she had with appellant on November 10, 2006, regarding the shooting and subsequent arrest. Ms. Grant was allowed to testify regarding the injuries to appellant that she observed during that consultation.

The defense then rested, and the motion for directed verdict was renewed for the identical reasons previously stated. The circuit court again denied the motion. The State then called James Cranford, Captain Bill Hickman, and Juan Reyes as rebuttal witnesses. At the conclusion of all the evidence, defense counsel again renewed the motion for directed verdict on the same grounds, and the renewed motion was again denied.

The jury returned a guilty verdict, and the resulting judgment and commitment order was filed on March 26, 2008. Appellant filed a timely notice of appeal on April 25, 2008, and this appeal followed.

*I. Denial of Motion for Directed Verdict*

A motion for a directed verdict is treated as a challenge to the sufficiency of the evidence. *Coggin v. State,* 356 Ark. 424, 156 S.W.3d 712 (2004). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Id.* On appeal, we view the evidence in the light most favorable to the State, considering only that evidence that supports the verdict. *Id.*

Weighing the evidence and assessing the credibility of the witnesses are matters for the fact-finder. *Bush v. State,* 90 Ark.App. 373, 206 S.W.3d 268 (2005). The jury is free to believe all or part of

any witness's testimony and resolves questions of conflicting testimony and inconsistent evidence. *See Gikonyo v. State,* 102 Ark.App. 223, 283 S.W.3d 631 (2008). Reconciling conflicts in the testimony and weighing the evidence are matters within the exclusive province of the jury. *See Mitchem v. State,* 96 Ark.App. 78, 238 S.W.3d 623 (2006).

Arkansas Code Annotated section 5–10–103(a)(1) provides that in order to be guilty of murder in the second degree, a person must knowingly cause the death of another person under circumstances manifesting extreme indifference to the value of human life. "Knowingly" is defined in Arkansas Code Annotated section 5–2–202(2) (Repl. 2006), which provides:

A person acts knowingly with respect to:

(A) the person's conduct or the attendant circumstances when he or she is aware that his or her conduct is of that nature or that the attendant circumstances exist: or

(B) a result of the person's conduct when he or she is aware that it is practically certain that his or her conduct will cause the result....

Appellant submits that the undisputed facts in the case are that a firearm was in her possession at the time she discharged the weapon in the direction of her husband, Mr. Johnson. However, she asserts that there is a factual question as to whether the firearm was accidentally discharged, rather than knowingly discharged. If the firearm was discharged accidentally or in self-defense, appellant maintains that she neither knowingly caused the death of Mr. Johnson nor did so under circumstances manifesting extreme indifference to the value of human life. She maintains that an accidental discharge, by definition, would be devoid of *mens rea,* and may be protected under

Arkansas Code Annotated section 5–2–607 (Repl.2006).

The question remains whether the shooting was done in such a fashion that appellant was aware that the attendant circumstances were such that her conduct would cause death or that it was practically certain that her conduct would cause the death of Mr. Johnson. She argues that despite the State's best attempt to prove otherwise, there is no evidence to suggest that she knowingly killed Mr. Johnson. To the contrary, she maintains that he abused her during the argument and that she was terrified for her safety at the time she pulled the gun from the car that he had been driving.

She acknowledges that, at the time of the shooting, she was in very close proximity to Mr. Johnson; however, after discharging the firearm two to three times, she merely hit him in the wrist. Appellant submits that she was surprised she hit him at all and even said to him at the time that she did not believe he had been hit.

Appellant contends that, in order to be convicted of knowingly causing the death of another person under circumstances manifesting extreme indifference to the value of human life, the State would have had to present evidence that she produced a gun, pointed it in the direction of Mr. Johnson, and discharged it without justification. Appellant points out that she was not charged with "purposely causing" the death of another person or the serious injury of another person, but rather, she was charged with "knowingly" causing Mr. Johnson's death. Testimony indicated that (1) appellant and the victim would fight on regular occasions, (2) they were both strong-willed, (3) they both gave as much as they got. As such, appellant urges that her motion for directed verdict should have been granted for the failure of the State to prove that she knowingly caused Mr. Johnson's death.

This is a credibility issue. Jurors may draw upon common knowledge and experience to infer a defendant's criminal intent from the circumstances. *See Harmon v. State*, 340 Ark. 18, 8 S.W.3d 472 (2000). Additionally, it is presumed that a person intends the natural and probable consequences of his or her acts. *Id.* On appeal, appellant does not contest the fact that she shot her husband in the wrist with a handgun or that he bled to death as a result of the wound. Instead, she challenges the proof presented by the State that she knowingly caused his death under circumstances manifesting extreme indifference to the value of human life.

In support of the verdict, the evidence showed that: appellant and the victim were in, or near, the victim's car at the time of the shooting; appellant fired a .38–caliber special revolver at least three times; the victim was struck in the wrist with one of those bullets, which traveled up his forearm, severed an artery causing massive bleeding that resulted in his death, and exited by his elbow; the top of the victim's head showed evidence of a blunt-force injury; the grip of the firearm was broken, found at the scene, and characterized as a "blunt object." Additional evidence indicated that the fatal wound was defensive in nature, in that appellant had pointed the gun at the victim, and that it appeared that she rendered no first aid to the victim after the shooting. Although appellant indicated that she and the victim had been arguing prior to the shooting and that he had pulled her violently by the hair from the front passenger seat across the driver's seat and out of the car, photographs showed various items in the passenger seat that appeared to be undisturbed. Appellant's voice was calm during the 911 call she placed after the shooting,

and she told officers upon arriving that she shot the victim, without any mention of the gun accidentally firing or that she feared for her life or serious bodily injury.

Appellant later testified at trial that she received injuries during the altercation, and her friend, Debbie Walthall, testified that appellant had bruises, scratches, and missing hair as a result of the altercation with the victim. However, neither Captain Hickman nor Detective Reyes noticed any injuries during her interview on the day of the incident, and appellant responded to their questions regarding any injuries that she had not been hurt. Ms. Grant, the nurse practitioner who examined appellant a few days after the incident, testified that she noted nothing more than minor injuries and that there were no wads of hair coming out as would have occurred had the victim dragged her out of the car consistent with her statement. Appellant also acknowledged that she and the victim had been having marital problems and discussing divorce, and that the victim would have obtained custody of her granddaughter in the event of a divorce because he alone had adopted her.

Substantial evidence was presented to support the jury's determination that appellant acted knowingly to cause the victim's death under circumstances manifesting extreme indifference to the value of human life. Accordingly, we affirm on this point.

## II. Admission of Compact Disc of 911 Call

Beth Craig, a Union County Sheriff's Office dispatcher who received a 911 call on November 8, 2006, testified that the call prompted her to send Deputy Lovett to Rhodes Chapel Road to investigate. Through Ms. Craig's testimony, the State attempted to introduce a compact-disc recording of the 911 call. Defense counsel objected, arguing that the 911 call and the recording of the call constituted hearsay. The State explained that the testimony was not being offered for the truth of the matter asserted, but rather was offered for the purpose of showing why Ms. Craig responded as she did. Defense counsel indicated that if such was the purpose of the testimony of the dispatcher, then there was no objection to the testimony, but he asked that the jury be instructed as to the purpose of the testimony. The circuit judge gave the following instruction:

Ladies and Gentlemen, this witness has testified to what she heard which usually you can't do if you are repeating something someone else is saying[,] but the State is offering this to show why she acted in the way she did, not offering for the truth of the matter but just what, how and why she reacted the way she did in her, in the course of her employment.

The instruction was followed by additional testimony from Ms. Craig explaining that after receiving the 911 call, she attempted to call back but got no answer. She stated that in one of the calls she could make out someone screaming and determined that they said "Rhodes Chapel Road." As a result, she then dispatched Deputy Lovett to the location to investigate.

The State subsequently attempted to play the recording of the previously referenced 911 conversations, at which time defense counsel objected on the basis that the recording of the calls was not relevant because Ms. Craig had already testified as to what was said and the consequence of the calls. The State responded that the playing of the recording went to the state of mind of the victim, to which defense counsel argued the State was now attempting to play the recording for the truth of the matter asserted. Defense counsel's objection was overruled.

The tape recording was not introduced into evidence until Detective Reyes testified and presented a proper foundation at that time. When the State attempted to introduce the actual compact-disc recording of the 911 calls, defense counsel objected that no foundation had been laid to indicate that the voice that was heard on the recording was that of the victim. The circuit judge asked the prosecutor, "It's been offered, as I understand it, to show why the sheriffs office responded to Rhodes Chapel Road. Is that correct, Ms. Rothermel?" In response, the prosecutor stated, "At this time, yes, your Honor." The circuit court then received the compact disc into evidence.

The State subsequently utilized the recording during appellant's cross-examination by the State for impeachment purposes, as follows:

Ms. Rothermel: So he was mad at you.

Appellant: Yes, ma'am.

Ms. Rothermel: He was mad at you this whole time.

Appellant: Yes, ma'am.

Ms. Rothermel: You've heard the 911 call, correct?

Appellant: Yes, ma'am.

Ms. Rothermel: He didn't sound mad, does he?

Appellant: Yes, ma'am.

Ms. Rothermel: You think he sounds mad?

Appellant: Yes, ma'am.

At that time, the State tried to replay the recording of the 911 calls, and defense counsel objected, again stating that the recording had been introduced solely for the purpose of showing why Ms. Craig had sent Deputy Lovett out to Rhodes Chapel Road. The State responded that it was not attempting to use the evidence for purposes of impeachment and argued that it should be admitted as an excited utter-ance. The circuit court allowed the recording to be replayed, stating that the objection would be overruled, and because the evidence had already been admitted, it could be used to question appellant about its contents.

Appellant acknowledges the wide discretion of the circuit court regarding evidentiary determinations and that this court will not overrule such a determination in the absence of an abuse of discretion. *See Smith v. State,* 354 Ark. 226, 118 S.W.3d 542 (2003). The threshold for reversal requires more than a simple error in the circuit court's decision; the circuit court must have acted improvidently, thoughtlessly, or without due consideration. *See Williams v. State,* 374 Ark. 282, 287 S.W.3d 559 (2008). Even where there is an abuse of discretion, there must also be a showing on the part of an appellant that prejudice resulted therefrom. *See Moore v. State,* 372 Ark. 579, 279 S.W.3d 69 (2008).

Appellant submits that once Ms. Craig testified that it was the 911 call that motivated her to dispatch Deputy Lovett, the playing of the tape was irrelevant, even for the initial purpose put forth by the State. Moreover, although the recording was admitted for a limited purpose, the circuit court subsequently allowed the State to use it to impeach appellant, despite the fact that no testimony had been elicited that indicated that the voice on the recording was actually that of the victim. She maintains that the ruling was prejudicial in that the circuit court basically allowed the State to use the recording for the purpose of proving that the victim made the call and sounded scared rather than mad. She contends that the emotion of the recording could have moved the jury to believe that the shooting was not in self-defense. As such, appellant argues that the circuit court erred in allowing the initial playing

of the recording as well as allowing the State to cross-examine her utilizing the recording for impeachment purposes.

Appellant appears to be arguing on appeal that the replaying of the recording was in error because the evidence was more prejudicial than probative and that it not only inflamed the jury but also called for speculation because no evidence had been presented that the voice on the recording was actually that of Mr. Johnson. We decline to find that the circuit court acted improvidently, thoughtlessly, or without due consideration in admitting the recording, and further note that any speculation at that point was cleared up by appellant's subsequent admission that the voice on the recording was that of Mr. Johnson.

### III. Admission of Photographs of Items from Victim's Car

State's Exhibits 27 and 28 are photographs taken at the crime scene of various items located in the front passenger seat of the victim's vehicle. At trial, appellant's counsel objected to the admission of the photographs, stating that there had been no testimony that the items were in their original positions and had not been moved. Counsel argued that the officers failed to testify unequivocally that the items had not been moved, merely stating that the crime scene area had been secured and occupied by only deputy and police personnel and that there would have been no reason for the items to have been moved.

Appellant submits that there simply was no testimony that clearly establishes that the items in the seat had not been moved subsequent to the altercation between appellant and the victim. Appellant argues that, until a foundation can be established that, in fact, none of the personnel at the crime scene moved the items in the front seat, the photographs were inadmissible.

Yet, not only were they admitted, the appearance of the undisturbed nature of the items was referenced by the State in closing argument when the prosecutor reasoned that, because the items in question appeared to be undisturbed, the testimony of appellant that she had been dragged across the passenger's seat and out the driver's door was not credible. She contends that the prejudice is apparent in that the comments undermined her self-defense argument.

The State initially argued that appellant's argument should not be reached because she failed to cite any authority or present any convincing argument on this point in her initial brief. *See Strong v. State*, 372 Ark. 404, 277 S.W.3d 159 (2008) (holding that appellate courts do not consider such arguments). In her response brief, appellant asserts that her initial argument was convincing and "certainly sufficient," that a lack of foundation is fundamental to the criminal jurisprudence when introducing evidence. She refers for the first time in her reply brief to Arkansas Rule of Evidence 402 (2008), which states that all relevant evidence is admissible, and that evidence that is not relevant is not admissible. Rule 401 (2008) defines relevant evidence as that evidence that has a tendency to make the existence of any fact that is of consequence more probable or less probable. She argues that the State had the burden of proving that the information they submit into evidence has in no way been tampered with by anyone or the jury is left to speculate as to whether the evidence has been disturbed.

Also in her reply brief, appellant cites *McMickle v. Griffin*, 369 Ark. 318, 254 S.W.3d 729 (2007), in which our supreme court held that a proper foundation must be laid in every instance that photographs are to be introduced, or if not, a reversible error would occur. She maintains that

the supreme court instructed that it was necessary that a witness testify that the photograph was not only a fair representation of the scene of the accident but also that the photograph was substantially similar to the circumstances at the time of the event that resulted in the photograph. In the instant case, appellant submits that, at best, they could testify that the crime-scene area had been occupied by only deputy and police personnel and that there was no reason for the items to have been moved. She urges that that testimony was insufficient to constitute the predicate foundation required.

While we note that it is a well-established rule of appellate procedure in Arkansas that issues raised for the first time in reply briefs are not considered on appeal, *see Schueck Steel, Inc. v. McCarthy Bros. Co.*, 289 Ark. 436, 717 S.W.2d 816 (1986), we address the underlying issue and hold that the circuit court did not abuse its discretion in admitting the two photographs. While we note that *McMickle* is a civil case, the standard for laying a foundation for the admission of photographs in a criminal case is also covered by Rule 901(a) (2008) of the Arkansas Rules of Evidence, providing that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The evidence before us suggests that the crime scene was in a remote location that was secured by officers shortly after the victim's 911 call was made and that the testimony presented was sufficient to support a finding that the matter in question is what its proponent claims.

Moreover, we agree with the State's contention that, even if the photographs were improperly admitted, no prejudice occurred because they were merely cumu-lative evidence. *See Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000). The officer who took the photographs, Detective Burton, testified that he saw the items in the front passenger seat of the victim's car at the scene when he arrived and that he did not touch them before photographing them. He testified that, to the best of his knowledge, no one had touched any of the items before he photographed them. The State submits that the photographs were merely cumulative to Detective Burton's testimony; accordingly, their admission was not prejudicial.

We acknowledge that Captain Hickman testified that the items appeared to be undisturbed, and that in closing argument, the prosecutor then asserted that because of that, appellant's testimony was not to be believed; however, there was testimony from Detective Burton, as well as from other officers, from which that argument could have been based. Accordingly, we hold no prejudice resulted from the admission of the photographs.

### IV. Admission of Transcript of Appellant's Statement

At approximately 12:28 p.m. on November 8, 2006, appellant gave her statement to Captain Hickman. The State offered the tape recording of her statement into evidence, along with a transcript of the recorded statement. The transcript was admitted over the objection of defense counsel based upon the fact that, although there was a material omission in the transcript, Captain Hickman testified that the transcript was a true and accurate transcript of the recorded statement. Captain Hickman acknowledged the omission on page 17, line 14 of the transcript on cross-examination. When listening to the recorded statement, Captain Hickman asks appellant,

I guess what I want to know is what you were feeling inside at that second, what made you shoot when you shoot [sic]? Was it pure fear? Was it I'm tired of this? Was it I'm scared, I'm not trying to put word [sic] in. . . .

The tape-recorded statement then follows with appellant's response, "I think a little of everything. I was scared. I was tired." It is undisputed that that particular statement from appellant is not included in the transcript. In the transcript, the entry following Captain Hickman's question, which appears where the response should be, is "Tape turn." Appellant argues that her response is critical to her defense. From that testimony, the jury would learn that she was tired of fighting with the victim and that she was scared. Yet in the transcript provided to the jury, that section was left out, which appellant claims is prejudicial.

Appellant acknowledges *Bell v. State*, 371 Ark. 375, 266 S.W.3d 696 (2007), for the proposition that appellate courts have upheld circuit court decisions allowing into evidence both the transcript and the recording of a defendant's statement. However, she notes that in *Bell*, the supreme court relied on *Baysinger v. State*, 261 Ark. 605, 550 S.W.2d 445 (1977), in which the supreme court held that the transcript was admissible because witnesses had testified that it was accurate and the defendant could not point to any prejudicial misrepresentations in the transcript. *Bell* likewise stands for the policy of allowing accurate transcripts to be used along side recordings that may be difficult to understand. She attempts to distinguish those cases because here we have a transcript that is not complete, and therefore not accurate. Because there is a misrepresentation of a crucial fact, that at the time of the shooting appellant was tired and scared, appellant maintains it was error to admit the transcript into evidence.

The State asserts that the testimony did establish that the transcript was a true and accurate transcription of appellant's tape-recorded statement, except for the omitted portion. The State focuses, not on what the omission was, but rather the fact that the omission was made known to the jury through Captain Hickman's testimony.

The jury was also instructed prior to hearing the recorded statement that the recording took precedence over the transcript and that, if there was any discrepancy between the two, they must follow what they heard on the recording. Additionally, the circuit court went further by retrieving the transcript and the juror copies of the transcript and not submitting them to the jury for use during deliberations. The State contends, and we agree, that, under these circumstances, the circuit court did not err by admitting the statement into evidence.

Alternatively, we agree with the State's assertion that there was no prejudice in the admission of the transcript. The jury heard the entire statement and appellant testified at length about her feelings regarding her relationship with the victim and the circumstances surrounding the shooting. Additionally, we hold that the circuit court took sufficient steps to explain the discrepancy between the recording and the transcript and took additional measures to remove the transcript copies from the jurors to ensure no confusion would occur during deliberations. Once again, we reiterate that this court will not reverse in the absence of prejudice. *Gaines, supra.*

V. *Admission of Opinion Testimony from Captain Bill Hickman Regarding Appellant's Mood Fluctuations During Her Statement*

During direct examination, the State asked Captain Hickman, "What were your

impressions of the defendant? How was she acting?" In response, Captain Hickman replied, "Distraught somewhat. Crying at times." The State followed-up by asking, "Did her mood fluctuate?" to which he responded, "Yes." The State continued, "Describe that for me. How did it fluctuate? If you can, if you can remember that far back." At that time, defense counsel objected, arguing that the jury had heard the tape, had heard appellant's mood and emotions. He argued that the jurors could form their own opinions as to what appellant did and that the requested opinion was within the purview of the jury. The circuit court overruled the objection.

Subsequent to the ruling, the State asked Captain Hickman, "Can you describe how her mood fluctuated?" to which he responded, "It would go from controlled to crying, from being in control to crying back and forth through the entire interview." The State then asked, "Did this give you any opinion as to the defendant's truthfulness during your questioning?" Defense counsel again objected, stating that such a conclusion was within the purview of the jury. The circuit court sustained that objection.

Appellant cites Arkansas Rule of Evidence 701 (2008) regarding opinion testimony by lay witnesses, which provides,

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) Rationally based on the perception of the witness; and (2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.

In this case, appellant concedes that Captain Hickman was present during the time of her giving the statement, and therefore, his opinion might be rationally based on the perception of the witness. However, she maintains that the same rational per-

ception could be had by the jurors by listening to the recorded statement. They could hear her emotion, from her crying to being less emotional, and back to crying again. Accordingly, she maintains that the testimony at issue was not helpful to a clear understanding of appellant's testimony or the determination of a fact in issue.

Appellant submits that prejudice occurred when Captain Hickman, an experienced law-enforcement officer, gave an opinion that appellant would go from "*controlled* to crying, from being in *control* to crying back and forth through the entire interview." (Emphasis added by appellant.) She urges that this could cause the jury to conclude that if an experienced detective such as Captain Hickman concluded that she was controlled, then they could conclude that she was manipulating her emotions and testimony.

Arkansas Rule of Evidence 702 (2008) deals with testimony by experts, and provides that

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In anticipation of the State asserting that Captain Hickman is an expert, appellant notes that the only information as to what that expertise would be was that he has been a law-enforcement officer for over thirty years. More importantly, she notes that at no time regarding this particular issue did the State try to assert that Captain Hickman was an expert. As such, she contends that the admission of the testimony indicating that she was "controlled" during her statement was error.

The State responds by citing Rule 602 (2008) of the Arkansas Rules of Evidence, which states that everyone is competent to be a witness, subject to the rules of evidence. Additionally, Rule 602 provides that a witness can testify about a matter if he has personal knowledge of it. The State notes that, although appellant argues that the testimony was not helpful to a clear understanding of appellant's testimony or a determination of a fact in issue, the determination to be made under Rule 701 is whether it was helpful to an understanding of Captain Hickman's testimony. Because he was testifying not only about her statement to the police but also appellant's demeanor after the crime and the discrepancies he noticed between her statements and the physical evidence, the State maintains that it was not an abuse of discretion to allow him to testify about his perception of the changes in her demeanor during her statement. We agree.

In *MacKool v. State*, 365 Ark. 416, 231 S.W.3d 676 (2006), our supreme court noted that police officers routinely testify about the demeanor of persons giving statements to them, even when the recorded statement has been admitted into evidence. We hold that *MacKool* is more indicative of the current situation than *Carton v. Missouri Pacific Railroad Co.*, 303 Ark. 568, 798 S.W.2d 674 (1990) (setting out a general three-prong test for determining admissibility of testimony under Rule 701, (1) the testimony must pass the "personal knowledge" test of Rule 602, (2) it must be rationally based, meaning an opinion that a normal person would form on the basis of the facts observed, and (3) the opinion must meet the "helpful" test). Here, evidence indicated that Captain Hickman was a trained interrogator who had conducted "a lot more than 100" suspect interviews over the course of his thirty-two-year career. We hold that he was

qualified to testify about appellant's demeanor under Rule 701 and the circuit court acted within its discretion to allow it.

Additionally, we find that no prejudice resulted, as the evidence in question was merely cumulative. *See Gaines, supra.* The jury heard appellant's tape-recorded statement, as well as Captain Hickman's testimony, that, during his interview of appellant, his impression was that she was somewhat distraught and crying at times. Accordingly, his testimony that her mood fluctuated "from control to crying from being in control to crying back and forth through the entire interview" was merely cumulative. Additionally, it is undisputed that appellant testified at length at trial, and the jury was able to see her demeanor, listen to her testimony, and compare what they heard on the tape-recorded statement. If appellant was concerned that Captain Hickman's comment could have influenced the jury to believe that she was "manipulating her emotions and testimony," her attorney could have questioned him as to exactly what he meant by the comment and asked the circuit court to strike any inappropriate testimony. This did not occur, and to the extent his argument on appeal is to salvage the point that he failed to preserve at trial, his attempt fails.

## VI. Admission of Opinion Testimony from Captain Bill Hickman Regarding Discrepancies in Appellant's Statement

During his testimony, Captain Hickman indicated, in response to a question from the State, that there were discrepancies between appellant's statement, the scene of the crime, and the photographs of the case that he reviewed. Defense counsel objected on the basis that no foundation had been laid as to Captain Hickman's training and education or the science be-

hind who had more or less force or power during the altercation between appellant and the victim. The circuit court directed the State to lay more foundation, at which time, Captain Hickman was presented a photograph that previously had been introduced and asked what was of significance to him. Captain Hickman responded,

> I'm looking at, and I'd like to point out that this, these foot impressions in this case would be somewhat different because we have a known set of circumstances. I mean she herself has put herself there, and we know who the other person was.... So, we have two known factors. We have another known factor that she was wearing these shoes.... My point it, the impressions that you see, and you have to spend quite a bit of time looking at it....

Defense counsel then objected again, and the following colloquy occurred:

> MR. DEPPER: I'm going to object. We don't have any more foundation made than when I made that objection a minute ago.
>
> MS. ROTHERMEL: He was about to say the impressions of the shoes, I believe.
>
> MR. DEPPER: We don't have anything relative basing his opinion on.
>
> THE COURT: I, I'm going to overrule it. I think he can testify to what he's interpreting in the picture.
>
> MR. DEPPER: There's no basis, lack of science judge, I'm sorry.
>
> THE COURT: The objection's overruled.

Captain Hickman then proceeded to interpret the photographs, asserting that they supported his previously stated conclusion that appellant had more freedom at some point during the altercation than the victim did, which was inconsistent with appellant's statement.

Referring again to Rules 701 and 702 as the governing provisions, appellant urges that if Captain Hickman was testifying as a lay witness, this testimony should not have been admitted. She cites *Marks v. State*, 375 Ark. 265, 289 S.W.3d 923 (2008), for the proposition that opinion testimony by lay witnesses is allowed regarding the observation of everyday occurrences or matters within the common experiences of most people. *See Felty v. State*, 306 Ark. 634, 816 S.W.2d 872 (1991). Captain Hickman testified as to the nature and character of the footprints at the scene and how they appeared in the blood around the vehicle, as well as how those footprints could be interpreted to mean that appellant's statement was inconsistent with that evidence.

Appellant argues that the analysis of footprints in blood is not an observation of everyday occurrences or matters within the common experiences of most people. As such, she maintains that the opinion testimony of Captain Hickman, testifying as a lay witness, should not have been allowed, and additionally, that no foundation was laid to establish the science behind his opinions and conclusions.

Once again, in anticipation that the State might argue that Captain Hickman was actually testifying as an expert, appellant reiterates that no foundation was laid to establish the credibility of the scientific methodology upon which he relied as a basis for his opinion. Accordingly, she submits that his testimony is inadmissible, citing *Green v. Alpharma, Inc.*, 373 Ark. 378, 284 S.W.3d 29 (2008), for the proposition that even when a proposed expert witness has many credentials, they are not dispositive of the issue of whether a witness can testify as an expert. A primary factor for the circuit court to consider in determining the admissibility of scientific evidence is whether the scientific theory can be, or has been, tested. *See id.; see also Ridling v. State*, 360 Ark. 424, 203

S.W.3d 63 (2005). Defense counsel objected to Captain Hickman's testimony on the basis of a lack of foundation, as it was never established, and therefore, appellant argues, should have resulted in the testimony being inadmissible.

■ The State maintains that appellant's argument regarding Captain Hickman's footprint analysis is without merit. We agree. At the time Captain Hickman testified regarding this issue, unchallenged testimony and photographic exhibits had already established which shoes were worn by the victim and which were worn by appellant. The State argues that the blood on the shoes and the differences in the treads were obvious. The same evidence, and specifically, unchallenged testimony from Detective Burton, a certified crime-scene technician, had established that there were pools of blood at the crime scene that contained shoe prints matching appellant's shoes and appeared to have been made by those shoes. Additionally, Detective Reyes, another certified crime-scene technician, had testified without objection that, from looking at the blood pools, the victim had spent some time at the backhoe area and that he had gone down on a knee or fallen in the three areas of blood pooling around the vehicle. Accordingly, the State argues that by the time Captain Hickman was asked his opinion on this issue, the jury had already seen and heard significant evidence regarding the signs of a struggle.

Regarding Captain Hickman's credentials, it is undisputed that he was the chief investigator for the Union County Sheriff's Office. He had thirty-two years' experience in law enforcement, was specially trained in homicide and other criminal investigations of cases involving a death, including crime-scene training. He testified that he had worked on between seventy-five and eighty homicide investigations during his career. He explained that appellant gave him the impression in her statement that there was a long struggle between the victim and her that the victim was in control a large part of the time after the first shot was fired. Captain Hickman testified that he felt there was a discrepancy between that statement and the physical evidence because the crime-scene photographs showed many impressions of her tracks, which led him to conclude "that she had more freedom at some point than [the victim] did." Additionally, he explained, "To make a point simple, if you start counting you will find an awful lot of her tracks." Other than that, Captain Hickman made no comments about any discrepancies that involved shoe prints. He did not tell the jury what conclusion to reach, but merely explained what conclusion he reached as a law-enforcement officer during his investigation of the crime. Moreover, Captain Hickman was extensively cross-examined about his comments regarding the shoe prints, as well as his conclusion concerning the accuracy of appellant's statement about who was in control during the altercation.

We hold that the circuit court did not abuse its discretion by admitting the testimony. See Flowers v. State, 373 Ark. 127, 282 S.W.3d 767 (2008) (holding that, under Rule 701, it was not error to allow an officer to testify based on experience, training, and observation that, in his opinion, glass on a truck had been broken from outside rather than inside); Navarro v. State, 371 Ark. 179, 264 S.W.3d 530 (2007) (holding that it was not error to allow an officer to testify based on experience that, in his opinion, it was not unusual not to find blood or fingerprints on objects, even after they had been touched or penetrated into a body); Robinson v. State, 353 Ark. 372, 108 S.W.3d 622 (2003) (holding that it

was not error to allow an officer to testify based on his experience as a murder investigator that, in his opinion, gunshot wounds to the head often result in very little blood loss).

## VII. Denial of Appellant's Motion for Mistrial

 Appellant acknowledges that it is well settled that a mistrial is an extreme and drastic remedy that will be resorted to only when there has been an error so prejudicial that justice cannot be served by continuing with the trial or when the fundamental fairness of the trial has been manifestly affected. *See Harrison v. State*, 371 Ark. 652, 269 S.W.3d 321 (2007). A circuit court has wide discretion in granting or denying a mistrial, and absent an abuse of discretion, the circuit court's decision will not be disturbed on appeal. *Id.*

Appellant moved for a mistrial upon the admission into evidence of the erroneous transcript of the statement appellant made to Captain Hickman. In the statement, appellant said in response to a question by Captain Hickman that she was "scared and tired" at the time of the shooting; however, that response was not contained in the transcript that was provided to the jury in conjunction with listening to the taped statement. Captain Hickman testified that the transcript was a true and accurate copy of appellant's statement, but this information was left out. The circuit court denied the motion for a mistrial, stating that the discrepancy goes to the weight of the evidence and not the admissibility.

Appellant maintains that Captain Hickman's error, in testifying that the transcript was true and accurate when it was not, was not remedied by the fact that the jurors had the transcript to follow while listening to the taped statement being played. She urges that the transcript mis-directed the jury, and that such misdirection is prejudicial and that her motion for mistrial should have been granted.

We hold that the circuit court did not abuse its discretion in denying the motion for mistrial. As previously discussed under point IV, there was no error in the admission of the transcript. Alternatively, any error was not prejudicial. Moreover, as noted by the circuit court, appellant was free to further point out the discrepancy to the jury as well as to replay the actual tape-recorded statement for the jury. The circuit court did a reasonable job in clarifying the discrepancy between the tape and transcript, and the jury was not left to its own devices to pick up on the omission.

We find no merit in appellant's argument that to require her at trial to point out the discrepancy after the officer has testified is tantamount to requiring her to prove her innocence, in effect shifting the burden of proof to her to prove her innocence. Appellant is improperly attempting to raise this constitutional argument for the first time on appeal. *See Rye v. State*, 2009 Ark. App. 839, 373 S.W.3d 354.

## VIII. Refusal to Allow Letter that Denied a Handgun Permit to the Victim

In order to show the victim's propensity for violence, appellant attempted to introduce a letter dated May 1, 1996, that was a denial of Mr. Johnson's application for a handgun permit. The letter included the following language: "A copy of Chief Tate's letter is enclosed." That enclosed letter was dated April 29, 1996, and included the following language: "Attached is his local history for your review." The referenced local history, however, was not attached to the documents. The previously referenced documents were maintained in the records of the Arkansas State Police

and were identified by Mr. Kirby, who maintains the records related to applications for gun permits. Mr. Kirby testified that the proffered documents were true and accurate copies of what was maintained in his state office.

Appellant submits that the circuit court denied the admission of the documents because of the missing attachment of the "local history" information. Appellant's counsel argued that the completeness of the letter, or lack thereof, went to the weight of the evidence rather than to the admissibility under Arkansas Rule of Evidence 803, subparagraphs (6), (8), and (21). Appellant also notes that the lack of the attachment was apparently the result of that document being maintained in a location separate from the May 1, 1996 and April 29, 1996 letters.

Appellant maintains that the proffered documents were admissible under subparagraph (6) as they were kept in the course of a regularly conducted business activity, the Arkansas State Police, which was established by the testimony of the custodian, Mr. Kirby. She points out that the missing attachment of the "local history" obviously spoke poorly of the victim, as it was the basis for the denial of the permit. She claims that the fact of its absence "should be a delight to the [S]tate" because the wrongful acts of the victim were not available for the jury to view.

With respect to Arkansas Rule of Evidence 803(6), the State notes that this court has held that, because subsection (6) does not mention a public office under the definition of "business," public reports are not admissible under that subsection. *See Wallin v. Ins. Co. of N. Am.*, 268 Ark. 847, 596 S.W.2d 716 (Ark.App.1980).

Subparagraph (8) states that records in any form maintained in a public office where agencies set forth regularly conducted and regularly recorded activities or matters observed pursuant to duty imposed by law are admissible. Here, the two letters, according to Mr. Kirby, are maintained by the Arkansas State Police, which appellant submits is clearly a public office consistent with the authority set out in this section.

The State acknowledges that Rule 803(8) provides for the admissibility of public records and reports as an exception to the hearsay rule, but specifically provides that investigative reports by police and other law-enforcement personnel are not within the exception, a statement which should encompass Chief Tate's pronouncements about the victim's propensity toward violence based on his "local history." In her response, appellant submits that the letter from Chief Tate was not an investigative report, but rather it was a statement of why he would not agree to the issuance of a handgun permit to the victim. She maintains that the letter was not like an accident report, but rather it was a statement of fact by Chief Tate based upon the public records of the City of El Dorado. Accordingly, appellant contends that the letter should have been admitted under Rule 803(8).

Additionally, subparagraph (21) states that the "reputation of a person's character among his associates or in the community is admissible." Appellant submits that the proffered letters speak to the reputation of the victim in the community, and therefore, were admissible. The State asserts that Rule 803(21) would not make the document admissible because there was no evidence that Chief Tate was an "associate" of the victim or that his opinion of the victim was shared by the community.

The State submits that even if the proffered exhibit was possibly admissible under one of the three exceptions provided in

Rule 803, it was properly excluded because its prejudicial value outweighed its probative value pursuant to the Rules of Evidence. Rule 401 provides that "relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Rule 403 provides, however, that although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The exhibit had been generated more than ten and a half years prior to the trial, making it too remote in time to be relevant. *Cf. Thompson v. State*, 306 Ark. 193, 813 S.W.2d 249 (1991) (holding that where the defendant asserted self-defense, but proffered no evidence of specific acts of violence by the victim that extended over the entire length of the relationship, the trial court properly limited such evidence to one year before the victim's death). Additionally, the State argues that Chief Tate's letter, without the attached "local history," was too prejudicial, given that it left the jury to speculate what acts of violence may have been committed by the victim. Accordingly, the State requests that the circuit court's ruling be affirmed.

Not surprisingly, appellant disagrees with the State's position that the proffered exhibit was more prejudicial than probative. She reiterates that her defense was that, at the time of the shooting, she discharged the firearm either accidentally or in self-defense. Regarding self-defense, she claims that not only would the fact that she and the victim were fighting and that she was being pulled out of the car by

her hair be relevant, but it would also be relevant that they frequently fought and each gave as good as they got as had been shown in the testimony. Also relevant would be appellant's knowledge that the victim had been so violent in the past that he was denied a handgun permit. She urges that this could explain why she had to point the firearm in his direction at the time it was discharged.

Regarding the age of the letter in question, appellant contends that it might have been properly deemed inadmissible had there been some evidence introduced that the victim had mended his ways and no longer demonstrated violent tendencies. That is not what occurred, and the related testimony was to the contrary. She maintains that the denial of the handgun permit was relevant to her knowledge of his propensity toward violence and evidence of her need to point the gun in his direction during the altercation for self-defense purposes. Appellant claims that prejudice occurred because the documents tend to show the victim's propensity for violence and the resulting reasonableness of her fear for her well being and reaction to his violent behavior on November 8, 2006.

To reiterate, our supreme court has held that circuit courts are afforded wide discretion in evidentiary rulings. *See Moore v. State*, 372 Ark. 579, 279 S.W.3d 69 (2008). We will not reverse a circuit court's ruling on the admission of, or refusal to admit, evidence absent an abuse of discretion, and, likewise, we will not reverse absent a showing of prejudice. *See id.* We hold that the circuit court did not abuse its discretion in refusing to admit the disputed letter.

### IX. Refusal to Allow Testimony of a Nurse Practitioner Regarding Potential Effects of Hydrocodone

During trial, appellant attempted to elicit testimony from nurse practitioner

Jean Marie Grant regarding the potential side effects of Hydrocodone, because the drug was listed in a toxicology report on the victim. The circuit court did not allow the testimony, finding that Ms. Grant did not have the appropriate qualifications. The circuit court indicated that in order to elicit such testimony, appellant would need to call either the physician that prescribed the medication or the pharmacist that dispensed it. Ms. Grant's testimony was proffered, and she explained that as a nurse practitioner, she prescribed the medication and would take into account the possible side effects it might have on a patient. She indicated that the basis for her knowledge of the potential side effects was based on her general knowledge as well as from the "Monthly Prescribing Reference" and the "Physician's Desk Reference" publications.

Ms. Grant then explained that the common adverse reaction to Hydrocodone is sleepiness. She also stated that some patients report nausea and vomiting and that long-term use can cause constipation. She mentioned that some patients can experience respiratory depression or mood swings or mood disorders; however, she acknowledged that the latter are not common.

Appellant urges that prejudice occurred when the circuit court did not allow Ms. Grant's testimony because the content goes to the heart of her defense. Specifically, she maintains that on November 8, 2006, her husband was reacting very negatively, consistent with the side effects of the Hydrocodone in his system. She urges that the presence of Hydrocodone in his system, along with his difficulties with family issues and previous "local history" of violence that caused him to be denied a firearm permit, could have collectively been used to explain that on the day in question Mr. Johnson might well have been violent enough toward appellant to justify her reaction.

The State maintains, and we agree, that the circuit court did not abuse its discretion by refusing to admit this testimony. Because the nurse-practitioner had never treated or examined the victim, was unaware of his other medications, and had no opinion regarding whether Hydrocodone caused him to act violently on the day he was killed, appellant's suggestion that the victim experienced the uncommon side effects of mood disorders or mood swings and acted violently toward her would have required the jury to speculate to reach that result. Additionally, appellant proffered no evidence from the victim's physician or pharmacist that the victim had experienced such side effects from taking Hydrocodone, nor did she proffer any evidence as to how the Hydrocodone interacted with his other medications, which included Lopressor, aspirin, an unnamed "heart pill," and vitamins. These shortcomings were recognized and discussed by the circuit judge as well as the prosecutor. We hold that there was no error on the part of the circuit court in refusing to allow the testimony.

Affirmed.

HART and BROWN, JJ. agree.